# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 17-178V
**Filed: July 26, 2019**
(Not to be published)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | |
| * | |
| LISA LIS,               * | |
| * | |
|       Petitioner,     * | Findings of Fact; Onset; |
| * | Shoulder Injury Related to |
|    v.                * | Vaccine Administration |
| * | ("SIRVA"). |
| SECRETARY OF HEALTH   * | |
| AND HUMAN SERVICES,   * | |
| * | |
|       Respondent.    * | |
| * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | |

*Bruce William Slane, Law Office of Bruce W. Slane, P.C., White Plains, NY, for Petitioner.*
*Ashley Monique Simpson, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ONSET[1]

**Oler**, Special Master:

On February 2, 2017, Lisa Lis ("Ms. Lis" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program").  The petition alleges that the influenza ("flu") vaccination Ms. Lis

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

received on October 2, 2015 caused her to suffer a Shoulder Injury Related to Vaccine Administration ("SIRVA") including a left labrum tear, bursitis and left shoulder impingement syndrome. Petition ("Pet.") at 1.

During the pendency of this matter, Petitioner submitted two affidavits that she authored, along with affidavits prepared by her husband, son, daughter, and a former coworker. The facts Petitioner presented in her affidavits relating to the onset of her medical symptoms differed from those documented in Petitioner's medical records. When discrepancies exist between medical records and affidavits, "Vaccine Rules 3(b) and 8(c), and the principles of fairness that underlie them, counsel in favor of holding an evidentiary hearing." *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006).

Accordingly, I held a fact hearing on December 19, 2018, by video teleconference ("VTC") in Washington, D.C., to determine the date of onset of Petitioner's shoulder injury. Mr. Bruce Slane appeared on behalf of Petitioner and Ms. Ashley Simpson appeared on behalf of Respondent. I heard testimony via VTC from Petitioner, her husband, Mr. Joshua Markle, her daughter, Ms. Saabrah White, and her former coworker, Ms. Margaret Willis.

After carefully considering the testimony of the witnesses, the medical records, affidavits, and documentary evidence, I find that the contemporaneous medical records more accurately reflect the onset of Petitioner's pain than the affidavits and other evidence submitted on her behalf. Specific factual findings are set forth in detail below. In summary, I find that Petitioner displayed symptoms of left shoulder pain beginning in January of 2016.

## I. Procedural History

On February 2, 2017, Petitioner filed a petition alleging that she suffered from SIRVA as a result of a flu vaccine administered on October 2, 2015.[3] Pet. at 1. Petitioner filed medical records on February 13, 2017 and December 4, 2017. ECF Nos. 7, 21. Petitioner filed her first affidavit on February 13, 2017 and her second affidavit on February 15, 2018. Ex. 7, 14.

On October 11, 2017, Respondent filed a Rule 4(c) Report ("Resp's Rept."). ECF No. 19. Respondent states that Petitioner has not provided evidence that satisfies her burden of proof under *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005), specifically noting that she did not seek medical attention for her shoulder until six months after receiving the allegedly causal flu vaccination. Resp's Rept. at 5. Respondent further states that Petitioner's records support a finding of onset no earlier than January 2016, when Petitioner did not report shoulder pain at her physical exam. *Id.* at 5. Respondent concludes that "[P]etitioner has failed to meet her evidentiary burden," and that "this case is not appropriate for compensation under the Vaccine Act." *Id.*

On December 4, 2017, Petitioner submitted an affidavit from her husband, Mr. Joshua Markle. Ex. 9. On January 11, 2018, Petitioner submitted an affidavit from her former coworker

---

[3] This case was originally assigned to the Special Processing Unit. ECF No. 4. The case was then reassigned to my docket on April 26, 2018. ECF No. 43.

and personal friend, Ms. Margaret Willis. Ex. 11.  On February 15, 2018, she submitted affidavits from her son, Mr. Sage Lis-Robinson, (Ex. 15) and her daughter, Ms. Saabrah White (Ex. 16).

I issued an order on August 1, 2018, scheduling a fact hearing in this case to determine onset of Petitioner's injuries. ECF No. 44.  I conducted the hearing on December 19, 2018 in Washington, D.C., via VCT. *See* Minute Entry of February 1, 2019.

Petitioner filed a motion to issue a subpoena on April 30, 2019 in order to obtain receipts from purchases at BJ's Wholesale Club and Target made during October 2015. ECF No. 48.  On June 6, 2019, I issued an order granting the motion. ECF No. 49.

On July 8, 2019, Petitioner filed receipts from Target and BJs (Exs. 17, 18) and indicated in a status report filed that same day that Petitioner had filed all the documentation ordered during the December 2018 fact hearing. ECF No. 52.  The matter is now ripe for adjudication.

## II. Petitioner's Medical Records

Petitioner was born on September 15, 1972. Ex. 1.  She was forty-three years old on October 2, 2015, when she received the allegedly causal flu vaccination in her left deltoid at her place of employment, Fuquay-Varina Pediatrics, in Fuquay-Varina, North Carolina. Ex. 2, ECF No. 7; *See also* Pet. at 1.

### A.  Petitioner's Medical History Prior to the Flu Vaccination

Petitioner's past medical history includes Non-Hodgkin's Lymphoma and prior neck and shoulder pain in 2013.  On August 27, 2013, Petitioner presented to North Central Family Medical Center ("NCFMC") with left shoulder and neck pain. Ex. 4.  Petitioner described the pain as having "arthritis" in her left shoulder that "feels like aching." *Id*. at 9.  Petitioner further stated that while she could sleep on it, she "[woke] up like it was jack hammered," and that the symptoms had been ongoing for a few weeks. *Id*.  Petitioner was given a basic physical exam and an "injection of left rotator cuff and bicep tendon." *Id*. at 13.  Additionally, if symptoms did not improve, a prescription of flexeril or gabapentin would be considered. *Id*. at 13.

On November 25, 2013, Petitioner again presented to NCFMC with neck and shoulder pain. *Id*. at 5.  The record does not clarify whether Petitioner presented with pain in the left or the right shoulder but assessed Petitioner's conditions as cervicalgia and "[p]ain in joint involving shoulder region." *Id*. at 7.  Furthermore, in the "Review of Systems" section, Petitioner is listed as having both joint pain and neck pain.  Petitioner was given flexeril and prednisone prescriptions and home exercise instructions. *Id*. at 7-8.

On December 31, 2013, Petitioner presented to NCFMC with a four-day history of cold symptoms. *Id*. at 2.  There is no mention of shoulder pain at this visit.

No other pre-vaccination records were filed by Petitioner.

3

### B.  The Flu Vaccination and Petitioner's Subsequent Medical History

After receiving her flu vaccination on October 2, 2015, Petitioner presented to Garner Internal Medicine for a routine physical exam on January 19, 2016. Ex. 7 at 5.  On that date, she visited Julie B. Queen, a Physician Assistant ("PA").  The record indicates that Petitioner was a "new patient [there] to establish care and for physical and pap." *Id.*  A full physical examination was performed and both general and gender-specific diagnostic testing were conducted. *Id.* at 9.  Under the "Review of Systems" section, neck and musculoskeletal reviews were negative for symptoms. *Id.* There is no mention in the medical records associated with this visit of any type of arm or shoulder pain.  *Id.*

One week later, on January 25, 2016, Petitioner's medical records indicate that Petitioner returned to Garner Internal Medicine for an appointment regarding a gynecological issue.  Ex. 7 at 2-3.  Petitioner was prescribed treatment for her diagnosed condition and no mention of shoulder pain was noted.

On March 27, 2016, Petitioner presented to WakeMed Emergency Room with complaints of "left sided neck and shoulder pain, for 1 week." Ex. 5 at 2.  Petitioner provided her medical history, stating that she awoke with her symptoms a week ago, and they have progressed since. *Id.* Further within the same record, the provider noted that "[petitioner's] pain has been present for 1 week, [sic] but notes her symptoms have been on going [sic] episodically for 2 months." *Id.* at 3. Petitioner's x-rays were negative for left shoulder injury but again showed the mild degenerative disc changes at C4-C5 and C5-C6.  The record indicates a suggested diagnosis of a strain of the paravertebral muscles and a mild case of torticollis. *Id.*  Petitioner was counseled regarding pain management and home exercises for her disc changes and subsequently discharged.

On March 29, 2016, Petitioner presented to Dr. Matthew Boes at Raleigh Orthopaedic Clinic, P.A. ("ROC").  Ex. 6 at 2.  The record indicates that Petitioner was experiencing an "insidious onset pain in the left shoulder for the last 3 or 4 months." *Id.*  The record further states that she had suffered from prior biceps tendinitis. *Id.*  Petitioner was diagnosed with left shoulder impingement syndrome and bursitis, given a cortisone injection, and instructed on a home exercise program. *Id.* at 3.  Petitioner was advised to return for an MRI if she did not improve within 3 to 4 weeks. *Id.*

Petitioner did not return until June and underwent MRI testing on June 11, 2016. Ex. 6 at 4.  Petitioner returned to Dr. Boes on June 21, 2016 for a follow-up to the MRI. *Id.* at 1.  The record indicates a "several month history of pain in the lateral aspect of her shoulder." *Id.*  After review of the MRI, Dr. Boes diagnosed Petitioner with a subtle anterior labral injury. *Id.*  He noted, however, that the findings were not consistent with Petitioner's symptoms. *Id.*  He further added that Petitioner would benefit from formal physical therapy since home exercises had been ineffective in improving her shoulder. *Id.*

## III. The Petition, Affidavits, and Documentary Evidence

The Petition filed in this matter states that Petitioner experienced a left shoulder injury immediately following her October 2, 2015 vaccination.  Pet. at 1.

### A. Affidavits

#### 1. Affidavit of Ms. Lis

In support of her Petition, Ms. Lis signed her first affidavit on January 31, 2017. Ex. 3. In it, she states that she received her flu vaccination in her left deltoid at Fuquay-Varina Pediatrics on October 2, 2015. *Id*. at 1. Ms. Lis describes her previous left shoulder injury in 2013 as an isolated incident, which resolved after a single cortisone injection. *Id*. She denies any other injury involving her left arm prior to October 2015. *Id*.

Ms. Lis states that her flu vaccination caused her immediate and severe pain in her left shoulder. *Id*. at 2. The pain worsened throughout the day, and it was difficult to sleep at night. *Id*. The following morning, Ms. Lis recalls that she had difficulty getting dressed. *Id*. Over the following weeks and months, Ms. Lis states that her arm pain developed into numbness down her arm and into her fingers and that she had difficulty conducting her daily routine. *Id*.

Ms. Lis states that she did not seek treatment immediately because she thought the pain was temporary. *Id*. at 2. When she presented to the emergency room on March 27, 2016, she was given a referral for an orthopedist. *Id*. Ms. Lis presented to the orthopedist but did not partake in the recommended physical therapy due to financial constraints. *Id*. at 3. Ms. Lis further adds that, as of the date of her affidavit, she still suffers from residual arm pain and has significant difficulty carrying or lifting weight, driving, using the telephone at work, washing, dressing/undressing, etc. *Id*.

#### 2. Second Affidavit of Ms. Lis

On February 2, 2018, Petitioner signed her second affidavit. Ex. 14. In it, she describes the timeline of her worsening arm pain following vaccination. *Id*. She states that, within a few weeks, she was aware that the pain she was experiencing was abnormal and was not resolving by means of at-home exercises. *Id*. at 2. She asserts that she told Dr. Boes that her arm pain began following the flu vaccine but worsened in the last 3-4 months. *Id*.

#### 3. Affidavit of Mr. Joshua Markle

Mr. Joshua Markle, Petitioner's husband, signed his affidavit on December 4, 2017. Ex. 9. He states that he met Petitioner in 2015 and lived with Petitioner at the time of the October 2, 2015 flu vaccination. *Id*. at 1. He confirms that he had never noticed any left arm injury prior to the vaccination and that Petitioner regularly used her left arm to exercise. *Id*.

According to Mr. Markle, Petitioner returned home on October 2, 2015 and complained that her shoulder was sore and aching since the flu shot. *Id*. at 1. He states that, in the following days, he noticed Petitioner having difficulty conducting everyday activities, including reaching high objects, carrying groceries, sleeping, getting dressed/undressed, driving, and cooking. *Id*. at 2. Mr. Markle states that he had to help her with these tasks. *Id*.

5

Mr. Markle recalls that Petitioner was unable to drive her children to their father's home on October 9, 2015. *Id*. He adds that, in the weeks following the flu vaccination, he noticed that Petitioner was not sleeping well at night and could not always sleep in the bed. *Id*. He states that Petitioner continued to complain about the shoulder pain, and he advised her to seek treatment. *Id*.

Mr. Markle believes that, as a nurse and vaccine coordinator, Petitioner is "fully aware if a shot has been administered incorrectly and the associated signs and symptoms." *Id*. Mr. Markle states that Petitioner did not participate in physical therapy as directed due to financial constraints. *Id*. He confirms that she still experiences pain in her shoulder as of the date of his affidavit. *Id*. at 3.

### 4. <u>Affidavit of Ms. Margaret Willis</u>

Ms. Margaret Willis, Petitioner's friend and former coworker, signed her affidavit on January 5, 2018. Ex. 11. She states that she worked with Petitioner in fall 2015-2016 and remains friends with Petitioner. *Id*. at 1.

Ms. Willis states that, two days after Petitioner's vaccination, Petitioner complained to her about her flu vaccination. *Id*. Petitioner described the flu shot as painful and "odd feeling." *Id*. Ms. Willis further adds that she observed Petitioner having difficulty using her left arm since the flu shot. *Id*. at 2.

### 5. <u>Affidavit of Mr. Sage Lis-Robinson</u>

Mr. Sage Lis-Robinson, Petitioner's son, signed his affidavit on February 12, 2018. Ex. 15 at 1. He confirmed that he was living with Petitioner at the time of the vaccination. *Id*.

Mr. Lis-Robinson recalls an incident following the flu vaccination when Petitioner attempted to retrieve his suitcase from overhead and it nearly fell on her. *Id*. He states that he had to run into the room to her assistance because she could not block the box that had fallen from a shelf in the closet due to her shoulder pain. *Id*. That weekend, his step-dad, Mr. Markle, had to drive him to his father's home since Petitioner did not feel that she could drive with her shoulder pain. *Id*.

### 6. <u>Affidavit of Ms. Saabrah White</u>

Ms. Saabrah White, Petitioner's daughter, signed her affidavit on February 12, 2018. Ex. 16 at 1. She states that she recalls Petitioner giving the family their flu vaccinations in October 2015 since she always gave her children their flu vaccinations. *Id*.

## B. Testimony at the Hearing

### 1. <u>Testimony of Petitioner</u>

Petitioner testified that she received her flu vaccine on October 2, 2015 in her left arm. Tr. at 6. She stated that she was employed as a nurse at Fuquay-Varina Pediatrics at the time of the

vaccination, and that all employees were required to receive flu vaccinations. *Id*. at 7.  At the end of her shift on October 2, 2015, her supervisor, Lisa Wolf, administered her vaccination and provided her with vials to take home and administer to her family. *Id*. at 7, 12.  She described the vaccination as unexpectedly and immediately painful. *Id*. at 7.  When initially asked to describe the location of the injection, Petitioner agreed that the shot was given in her left deltoid muscle about three inches from the top of her shoulder and about an inch from the bottom. *Id*. at 11.  When asked a second time later in the testimony, Petitioner clarified that it was administered closer to 2.5 inches from the top of her shoulder and higher than where she would administer a flu vaccination. *Id*. at 51-52.

Petitioner recalled that she had injured her left shoulder and neck back in 2013, when she worked at NCFMC. Tr. at 29.  Petitioner recounted the incidents leading up to the injury in 2013 and stated that she sought treatment from one of the doctors at her place of employment. *Id*. at 32.  Petitioner described her former personal training business and her history of physical fitness before stating that her 2013 injury likely arose from overexertion during exercise. *Id*. at 31, 110.  Petitioner testified that she was diagnosed with bicep tendinitis and given a cortisone injection. *Id*. at 32.  She stated that this injection completely resolved her shoulder pain and no further treatment was necessary. *Id*. at 32.  Petitioner denied seeking treatment for left shoulder pain at any other time. *Id*. at 33.  Moreover, Petitioner testified that as of 2014, she no longer performed personal training. *Id*. at 92.

Petitioner stated that on the day of the vaccination, she went home, treated the pain with Motrin (ibuprofen), and administered flu vaccinations to her family members, her husband, his two sons, and her son and two younger daughters. Tr. at 12-13.  Petitioner testified that she continued to treat the pain with Motrin in the days and weeks following the vaccination. *Id*. at 12, 21.  When she woke up the morning following the vaccination, Petitioner described her arm as "heavy and stiff." *Id*. at 18.  She stated that she took Motrin and went to work as usual. *Id*.  At work, Petitioner stressed that she did not speak to anyone regarding her flu shot or the pain in her left arm, apart from with Margaret Willis, her coworker and friend. *Id*. at 19.  Petitioner added that the pain continued through the following week and felt "heavy and painful…sharp... almost like burning." *Id*. at 21.

Petitioner clarified that she did not feel comfortable discussing her arm pain at work. Tr. at 22-23.  She added that she did mention pain from the flu vaccination to her supervisor several weeks after the vaccination but testified that her supervisor laughed it off. *Id*. at 23, 62-63.  She affirmed that the only person at work she spoke with was Margaret Willis, and that Ms. Willis would advise her to have the pain evaluated. *Id*. at 23.  Petitioner testified that she did not mention her arm pain to a provider at work because she worked in a pediatric office and she did not think it was appropriate to ask a pediatrician for adult medical advice.  *Id*. at 99-100.

Petitioner stated that the reasons for not seeking treatment until March 27, 2016 were partly financial. Tr. at 23-25.  During the time that Petitioner worked at Fuquay-Varina Pediatrics, Petitioner testified that she did not have insurance through her employer. *Id*. at 24.  Instead, Petitioner clarified that she had personally-acquired, short-term insurance policies with deductibles ranging from $5000 to $7500 per six-month period. *Id*. at 24.  Furthermore, Petitioner's daughter was frequently ill in the year leading up to her flu vaccination. *Id*. at 24.  As

such, Petitioner did not find it financially prudent or possible to seek treatment for her pain. *Id*. at 24-25. Petitioner testified to this point numerous times, reiterating that she did not find it cost-efficient to seek treatment for her shoulder pain until it was no longer bearable. *Id*. at 81, 83-84.

Petitioner testified that she did not realize to what degree her pain had worsened until late October. Tr. at 25. Petitioner recalled an incident when her son had to rush into a room to stop a plastic container from falling on her face because Petitioner could not raise her left arm to block it herself. *Id*. at 25-27. Petitioner stated that it was in late October or early November that she realized her pain had worsened to a serious degree. *Id*. at 25-26, 90. Between November and March 27, 2016, when she first presented to the emergency room for shoulder pain, Petitioner testified that she would treat the pain using topical ointment, wedge pillows, and daily ibuprofen. *Id*. at 75-76.

Petitioner further testified that she had to modify her daily activities after the October 2015 flu vaccine. Tr. at 41-43. She stated that she was no longer able to exercise due to her arm pain or drive using that arm. *Id*. at 73. She added that, beginning in November, the pain had progressed such that she was no longer able to dress herself and often required assistance in the bathroom. *Id*. at 41, 70. She felt the modifications left her embarrassed and humiliated. *Id*. at 42, 71.

Petitioner testified that, when she presented for her annual exam, she mentioned her arm pain to her PA. Tr. at 44, 68, 70-71, 102-03. She stated, however, that she was there for women's health visit and did not focus on her arm pain at that visit.[4] *Id*. at 44, 103. She added that her PA did offer to provide a referral to orthopedics, but she did not take it due to the cost of going. *Id*. at 44-45, 68. She stated that, by this time, she was already having major difficulty with everyday activities. *Id*. at 70-71, 102.

Petitioner discussed her March 27, 2016 emergency room visit. Tr. at 35. She stated that the pain had become unbearable over the past week, and she presented at the emergency room with left shoulder pain. *Id*. at 35. Petitioner testified that her records from this visit were incomplete, as they did not note her complaint of pain dating back six months to October 2015. *Id*. 85-88. While Petitioner did not recall the exact history she had offered at that time, she stated that the record's indication that she dated her pain back only two months was inaccurate. *Id*. at 88. Petitioner also testified that she did not provide lengthy time periods for her ongoing pain because she did not feel that they wanted to hear a lengthy time frame or would think she was "pain-seeking for medication." *Id*. at 36, 82-83.

Petitioner testified that the records were inaccurate as to the onset interval of her arm pain. Tr. at 86-96. She argued that the records from Dr. Boes, indicating shoulder pain at three to four months (Ex. 6 at 2) or several months (Ex. 6 at 1), illustrated a more accurate onset time frame. *Id*. at 86-96. Petitioner agreed that she may have recounted her pain as ongoing for three to four months prior to her March 29, 2016 visit with Dr. Boes because she would have considered four months prior to be generally the month of November. *Id*. at 90-91. She stated that November was

---

[4] While Petitioner was provided gender-specific care, there is no indication that this was solely a women's health visit. In fact, the records indicate that a full physical was conducted, and Petitioner visited Julia McQueen, PA, at an internal medicine practice.

a "turning point where [she] knew something was wrong." *Id*. at 90.  She further asserted that the term "several months" was accurate in dating her pain back to her flu vaccination. *Id*. at 94-95.

Petitioner testified that she did not attribute her left arm pain back to the flu vaccination until after her March 29, 2016 orthopedics appointment. Tr. at 90.  However, Petitioner recollected on numerous occasions that the pain affirmatively began immediately following her flu vaccination and gradually worsened. *Id*. at 90-91.

Furthermore, Petitioner testified that she spoke with her supervisor, Lisa Wolf, prior to her March 27, 2016 emergency room visit, and she attributed her shoulder pain to the flu vaccination in these conversations. *Id*. at 23, 62-63, 100.  Still, Petitioner testified to the following:

Q: Did there come a point in time where you started looking for an attorney?

A: You know, my husband – I'm in medical so, you know, you just always – you know, you have a reason for everything. My husband is an engineer. And everything has to make sense. He always has to, like, pick every little thing apart. And he kept saying to me, you know, what – when – we couldn't pinpoint it.

I started Googling, you know, what can cause this. And literally I was sitting out on my patio and I was Googling, and I'll never forget the day, it was – sunny and warm and I was just out there and I was just Googling and for whatever reason, I don't know what hit me, I don't know what made me think of it, can you get shoulder pain from a shot? You know, can this real – could it – because I did not do anything to cause this. So there was nothing. And I know it was months after, but it was like nothing in my mind was making sense. Like, I didn't injure my arm. I didn't do anything to injure my arm and I can't – the pain was just – and the information that surfaced from that was unbelievable.

Q: Was this before you went to the orthopedist or after you went to the orthopedist?

A: This was after.

*Id*. at 37-38.

## 2.  <u>Testimony of Ms. Margaret Willis</u>

Ms. Margaret Willis testified that she met Petitioner in August 2015 when Ms. Willis began her employment at Fuquay-Varina Pediatrics. Tr. at 120.  She confirmed her personal friendship with Petitioner and stated that they spoke, and still speak, frequently. *Id*. at 120.

Ms. Willis testified that she had several conversations with Petitioner regarding her flu shot and arm pain in the days and months following the vaccination. Tr. at 122, 128, 129, 131, 133, 139, 144.  She stated that the Petitioner's first complaint to Ms. Willis was a few days after the vaccination. *Id*. at 122-25, 139.  She testified that it was progressively apparent by observation that Petitioner's arm pain was worsening. *Id*. at 125.  She further stated that the complaints of pain

were more frequent as time passed. *Id*. at 144.  She added that Petitioner complained in November that pain medications and icing her shoulder were no longer working. *Id*.

Ms. Willis testified that Petitioner attributed her pain directly to her vaccination in conversations with Ms. Willis in early to mid-October. Tr. at 128.  Ms. Willis testified to the following conversation she had with Petitioner in October:

> Q: Did you ask her what was going on?
>
> A: I did.
>
> Q: And what did she say?
>
> A: Well, at this point she started saying that she really thought that the flu vaccine – something happened. There was some injury; there was something else; it was not a regular flu vaccine because no one else in the office had had anything happen after their flu vaccine. It was just becoming apparent.

*Id*. at 128.  She was later asked about her conversations with Petitioner in November:

> Q: What sorts of things – I'm sorry to interrupt you. What types of things would she say to you when she spoke about her pain in November?
>
> A: She would say that her arm still hurt after having that flu vaccine, and that she didn't know what it was about that vaccine, but something happened and she just couldn't get away from this pain….
>
> Q: So she directly attributed that pain to the flu shot?
>
> A: Yes, she did.

*Id*. at 144.

Ms. Willis testified that her conversations with Petitioner regarding this incident were in person and were not through text or social media sites. Tr. at 139, 149-51.  Furthermore, Ms. Willis testified that she believed Petitioner could no longer continue her personal fitness training business due to her shoulder injury. *Id*. at 138.

### 3.  <u>Testimony of Mr. Joshua Markle</u>

Mr. Joshua Markle testified that he is Petitioner's husband. Tr. at 153.  Mr. Markle confirmed that at the time of the vaccination he and Petitioner were not married but were living together full time. *Id*. at 154-55.  He stated that he knew Petitioner to be a very independent and physically active person. *Id*. at 156-59.

Mr. Markle testified that he was at home the day that Petitioner received her vaccination, and, subsequently, he and the children also received their vaccinations. Tr. at 160.  He recalled the day as ordinary and recalled Petitioner recounting for him the soreness arising from her own vaccination. *Id*. at 160.  Mr. Markle stated that the following morning Petitioner did not make breakfast for the family as usual. *Id*. at 161.  He assumed her arm was still sore but that she was more concerned with one of the children running a slight fever. *Id*. at 161.

Mr. Markle also testified about the level of pain he observed in Petitioner and the level of assistance Petitioner required with her daily routine.   In October, Mr. Markle stated that Petitioner's pain progressed from her shoulder up through her neck and into her back and would require massaging of her neck and shoulder. Tr. at 163.  As October progressed, Mr. Markle described Petitioner's pain as a burning sensation. *Id*. at 164.  To relieve the pain, Mr. Markle testified that Petitioner used topical ointments, aspirin, and muscle rollers. *Id*. at 165.  Within a couple of weeks of trying these methods, he became aware that Petitioner was not sleeping in bed due to pain. *Id*. at 165.  Mr. Markle testified that they then purchased an elevated pillow to assist with sitting in bed. *Id*. at 165.

Mr. Markle testified that by November, Petitioner's condition was deteriorating. Tr. at 167. He stated that by November/December they were utilizing every method possible to decrease Petitioner's pain. *Id*. at 167.  He further stated the following:

> A: ... And then, you know, towards the beginning of the new year in the January time frame, February is when we really started noticing that things got bad. And that's when I basically – I don't want to say demanded, but requested that she go to the emergency room. And we took her to the emergency room then in March time frame.

*Id*. at 167.  Mr. Markle continued, testifying that in October, November, or December, he was not aware that Petitioner was not sleeping in the night. *Id*. at 168, 169.  He confirmed that he did not tell Petitioner to seek treatment because he observed Petitioner somewhat successfully manage her pain with over-the-counter medication. *Id*. at 169.  Mr. Markle testified that in January and February 2016, Petitioner exhibited limited mobility. *Id*. at 170.  He stated that he realized the severity of Petitioner's pain only after the orthopedic visit. *Id*. at 170.

Mr. Markle stated that by beginning to middle of November, Petitioner required regular assistance with getting undressed. Tr. at 175.  He testified that in February, approximately when he became aware that she was not sleeping well, he also had to begin washing her hair for her. *Id*. at 177.  Later, Mr. Markle testified that from November 2015 to July/August 2016, he assisted Petitioner with washing her hair. *Id*. at 189.

Mr. Markle testified that he had accompanied his wife to the emergency room visit, the MRI visit, and the MRI follow-up appointment. Tr. at 172.  He testified that he recalled Petitioner telling the physician about her pain and lack of sleep but could not recall her comments regarding onset. *Id*. at 173-74.

Mr. Markle testified that, until after the emergency room visit, he and Petitioner had not identified a root cause for Petitioner's pain. Tr. 163, 191-93.  In October, he stated that they considered different aspects of her routine and her arm usage in order to identify the cause of the pain. *Id*. at 163-64.  He later stated that he did not tell Petitioner to seek treatment because they had not yet identified the cause. *Id*. at 191.

> Q: Okay. So with the reports of a burning sensation in her arm and pain radiating down her shoulder from October; you having to help her with, like, hygiene tasks, like washing her hair or putting on her bra or taking off her clothing and you finding out that she wasn't sleeping in January, why didn't you insist that she go to the doctor in January or November or October?

> A: Well, it was – again, like I had mentioned earlier in my testimony, you know, we were trying to understand what potentially could have been influencing this; why run to a doctor when it could just be something and do a change in your routine; the way you're sitting, for example could be putting pressure on your spine in an awkward way that causes you to go home at night and have headaches.

> With that being said, until you evaluate all potential conditions that could cause the symptoms and the fact that it was a radiating pain from the shoulder up through the neck, down into the back of the shoulder, there was no identifying cause as to what truly was doing it. And we aren't going to go spend money that we don't have for a doctor appointment if it's something that we can resolve just by evaluating her daily routines, as I stated earlier.

*Id*. at 191-92.  Mr. Markle testified that he and Petitioner only considered the flu shot as a possible cause after Petitioner's initial visit to the orthopedist. *Id*. at 193.

> Q: So at what point did you and your wife realize that it was the flu shot that was causing her pain?

> A: That's a good question. It would have had to have been after – after the emergency room visit; probably two weeks or so after that. Again, we continued to utilize the internet, WebMD and multiple other sites to try and understand what could be causing these issues. And at one point, you know, she had found a blog or a web notice or something that stated that a flu vaccine could potentially cause this. And that's when we started connecting the dots and tracking stuff back to basically the flu vaccine.

*Id*. at 193.

### 4.  <u>Testimony of Ms. Saabrah White</u>

Ms. Saabrah White testified that she is Petitioner's daughter, is currently 18 years of age, and does not reside regularly with Petitioner. Tr. at 196.  She testified that she would see Petitioner during holidays and the summer. *Id*. at 196-97.  She further stated that, when she was in school,

her mother resided in South Carolina and she lived with her father in Cary, North Carolina, about one to two hours away.[5] *Id.* at 197.  She testified that until she received her driver's license this past year, she did not see her mother outside of summers and holidays. *Id.* at 198-99.

Ms. White testified that she received her flu shot in 2015 but could not recall details regarding the day. Tr. at 200.  She testified that Petitioner said her shoulder "kind of hurt, but that she could hopefully sleep it off." *Id.* at 200-01.  Ms. White further stated that she could not recall how long she was with her mother for the trip during which she received her vaccination or when she returned to her father's. *Id.* at 202.

Ms. White testified that she could remember a point months later when her mother complained of shoulder pain. Tr. at 201.  She added that she tried to assist her mother with chores at that time. *Id.*  Ms. White stated that, following the flu vaccination, she did not see her mother until around middle to late December, for her brother's birthday party. *Id.* at 203.

Ms. White could not recall the next time she saw Petitioner or whether she saw her for the holidays in 2015. Tr. at 205.  She testified that over the past few years, since 2016, she assisted Petitioner with household chores. *Id.*  When asked if she had any conversations with Petitioner regarding her arm pain, Ms. White stated that she asked a few times if Petitioner "[was] doing okay" and if she should assist with chores. *Id.*

When asked whether Ms. White recalled Petitioner complaining about her arm pain on the day Ms. White received her vaccination, she clarified that "it was either the day or someday after. I can't quite recall." Tr. at 206.

### C.  Other Evidence

Petitioner filed receipts from BJs which indicate that she purchased Aleve 160/220M liquid gels (160 gels, 220 milligrams in strength) on October 17, 2015. Ex. 18 at 57.  Because this purchase took place 15 days after vaccination, it lends some support to her claim of pain during this period of time.  A review of the entirety of the exhibits (exhibits 17 and 18) reveals that aside from this purchase, other similar purchases include Tylenol on August 19, 2016, and Advil PM on February 28, 2016 and August 19, 2016. *Id.* at 98, 105, 133.

It is unclear from the testimony at hearing which or how much of these medications Petitioner used.[6]  Ultimately, I find exhibits 17 and 18 to be of limited value.  They demonstrate

---

[5] Ms. White testified that during summers, she spent time with her mother in South Carolina. Tr. at 197, 199.  She further added that, at the time in question, she lived with her father in Cary, North Carolina and still currently resides with her father. *Id.* at 197.  Petitioner testified that she received her vaccination in October 2015 at Fuquay-Varina Pediatrics in Fuquay-Varina, North Carolina.  She further stated that she had moved to North Carolina as late as 2014 for work and still currently resides there. *Id.* at 6, 33.  As such, Ms. White's statements regarding place of residence are unclear.  These statements, however, are not dispositive of the outcome of the case.

[6] Petitioner repeatedly indicated that she took Motrin for her pain.  *See* Tr. at 12, ("But I realized every day it seemed like I was taking Motrin and taking Motrin."); Tr. at 18 ("Yeah, ibuprofen yeah, over-the-counter

that Petitioner purchased Aleve in October 2015. Although she may have purchased other pain medication from a different store at a different time, that evidence is not before me. While I have considered exhibits 17 and 18, these documents did not outweigh the other evidence discussed in this ruling.

## IV. Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing her claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

---

ibuprofen."); Tr. at 21 ("I felt like I was popping Motrin like Tic-Tacs."); Tr. at 67 (reference to taking Motrin and Tylenol); Tr. at 75 (was taking 400 milligrams of Motrin every six to eight hours). Petitioner also testified that she took Aleve for her shoulder pain. Tr. at 107. Petitioner did not testify about taking Advil PM.

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).  A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination.  *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

## IV. Findings of Fact

In order to overcome the presumption that contemporaneous written medical records are accurate, testimony must be "consistent, clear, cogent, and compelling."  *Blutstein*, 1998 WL 408611, at *5.  Because of this presumption, "special masters in this Program have traditionally declined to credit later testimony over contemporaneous records."  *Sturdivant v. Sec'y of Health & Human Servs.,* No. 07-788V, 2016 WL 552529, at *15 (Fed. Cl. Spec. Mstr. Jan. 21, 2016).  *See, e.g., Stevens v. Sec'y of Health & Human Servs.*, No. 90–221V, 1990 WL 608693, at *3 (Fed. Cl. Spec. Mstr. Dec. 21, 1990); *see also Vergara v. Sec'y of Health & Human Servs.*, No. 08–882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. Jul. 17, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); *See also, Cucuras*, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight").

There is a single factual issue to be determined in this case: the date of onset of Petitioner's shoulder pain.

### A.  Medical Records

Petitioner's first medical visit following the allegedly causal vaccination was with Julie McQueen, PA at Garner Internal Medicine on January 19, 2016 for an annual physical exam. There are no indications of left shoulder or arm pain in the records.  At that appointment, Petitioner received a full physical examination and received both general and gender-specific care.  She returned one week later for a second appointment with concerns regarding a feminine issue.

The emergency room visit from March 27, 2016 was the first time that Petitioner sought treatment for her shoulder pain. *See* Ex. 5.  The record from that visit initially indicated onset at one week prior to March 27, 2019.  The provider later revisited the issue of onset, to clarify that

Petitioner's ongoing symptoms of two months *worsened* in the past week.[7]  I find this record to be persuasive in detailing Petitioner's onset, since the time frame of onset is described with purpose and specificity.  The second notation represented the conscious effort on the part of the transcriber to supplement the record with the more precise description of Petitioner's account.  Furthermore, a two-month time frame would place onset of Petitioner's symptoms after her January 2016 doctor's visits at which no notation of shoulder pain was documented.

There are two additional records that mention the onset of Petitioner's pain.  Petitioner's orthopedic records date her shoulder pain back three to four months prior to the initial March 29, 2016 visit and "several months" prior to the June 2016 visit.  These records do not suggest an exact timeframe of Petitioner's onset, but rather the orthopedist's estimated range for onset.   At the earliest, the generalized time frame of the first record would place Petitioner's onset of pain in December 2015 and not immediately after the vaccination as Petitioner suggested.  The second record, noting a "several month history of pain" is too nondescript to imply a specific date of onset.

Thus, I find that the medical records support an onset on or around January 27, 2016, after her physical and two months prior to her March 27, 2016 emergency room visit.

### B.  Testimony at Hearing

I found the testimony of the witnesses to be unclear and inconsistent as to the onset and severity of Petitioner's pain, the association of pain with the flu shot, and the reasons for not seeking medical care immediately.

In her testimony, Petitioner stated that her shoulder pain began immediately after the flu vaccination and gave three main reasons for delaying her initial consultation for her pain.  First, Petitioner stated that she did not believe her shoulder pain was severe enough to seek medical attention until March 27, 2016.  She felt that the pain immediately following her vaccination was normal and that, as time passed, the pain worsened but was manageable.  Nevertheless, Petitioner testified that by late October, she had realized the severity of her shoulder pain.  She stated that her range of motion had decreased considerably, and she could no longer continue normally with her daily routines.  Petitioner testified that the pain was so severe that she couldn't sleep and needed assistance with everyday activities, such as carrying bags, lifting objects, and driving.  Both she and Ms. Willis testified that, by November 2015, pain medication and icing were no longer working to ease Petitioner's pain.  She added that, by January, she required regular assistance dressing herself and washing her hair and did, in fact, mention her shoulder pain at her physical exam.[8]  Petitioner further stated that, on March 27, 2016, she did date her pain back six months. Later, however, she testified that she did not provide lengthy time periods to providers for her ongoing pain because she did not feel that they wanted to hear a lengthy time frame or would think

---

[7] Specifically, the records noted that "[Petitioner's] pain has been present for 1 week, [sic] but notes her symptoms have been on going [sic] episodically for 2 months." Ex. 5 at 3.

[8] I reiterate that no notation regarding Petitioner's shoulder pain was found in the medical records from her January 2016 physical.

she was "pain-seeking for medication." Tr. at 36, 82.  Petitioner's testimony regarding the onset and severity of her pain is inconsistent.

Second, Petitioner and her husband testified that they were reluctant to seek treatment until they had identified the cause of Petitioner's shoulder pain.  Petitioner stated that she was not aware at the time that the pain was still a result of her flu shot.  Instead, Petitioner and her husband testified that they attempted to eliminate all possible causes of her shoulder pain and adapted her activities to accommodate for the pain in her shoulder.  Petitioner stated that it was not until after her March 2016 orthopedic appointment that she connected her flu shot to her arm pain.

I am not persuaded that Petitioner's desire to identify the cause of her pain contributed to a delay in seeking treatment.  Petitioner's coworker and friend, Ms. Willis, testified that Petitioner had attributed her pain to her vaccination in October.  Tr. at 128.  Petitioner herself testified that, several weeks after her vaccination, Petitioner reported her shoulder pain following flu vaccination to her supervisor.  *Id.* at 23, 62-63.  She testified that her supervisor disregarded the possibility of pain so long after vaccination.  In light of the conflicting nature of the testimony, it is difficult to conclude that this testimony suggests an earlier onset date than the one established by the medical records.

Finally, Petitioner cited her financial situation as a significant concern.  Petitioner testified that her insurance deductible at that time was high and that she could not afford to spend her limited finances on personal medical visits.  She added that her daughter had been frequently ill that year and that it was her priority to ensure funds were available for the medical care of her children.  She reiterated that her shoulder pain did not warrant a costly trip to seek treatment until the pain was severe.

This testimony does not correlate with Petitioner's choice in seeking medical care at the emergency room.  Instead of visiting an orthopedist due to the cost of visits, Petitioner testified that she preferred to present to the emergency room and pay the resulting invoice through a payment plan.  I find this explanation unconvincing, since the cost of her emergency room visit, even on a payment plan, would have covered the cost of an orthopedic consultation and several physical therapy appointments.[9]

Furthermore, as previously discussed, Petitioner visited her PA for a physical examination on January 19, 2016, and there is no indication in the record that her shoulder pain was mentioned at that visit.  On January 25, 2016, Petitioner again presented to her PA with a minor feminine issue.  Petitioner testified that, while the physical exam was partially covered by insurance, the second visit would not have been covered by insurance. Tr. at 102.  I find the testimony regarding financial feasibility unpersuasive given that Petitioner did not utilize the first appointment to seek treatment for her shoulder pain and, instead of addressing her shoulder pain, paid for an additional appointment to address a minor feminine issue.  At this point in time, Petitioner's husband was

---

[9] Petitioner testified that the emergency room visit cost her between $4000-5000, none of which was covered by insurance. Tr. at 39.  Petitioner further added that she had priced physical therapy options and that the initial visit would cost $200, with subsequent visits ranging from $85-$110. *Id.* at 80.  I note that the charge for the emergency room visit alone would have covered the cost of at least 40 physical therapy appointments.

regularly helping her to get dressed and undressed and was helping her wash her hair.  It seems logical that Petitioner would have mentioned these symptoms to her provider, when she was already paying for the doctor's visit(s) in January 2016.  The fact that she did not supports a conclusion that Petitioner did not experience shoulder pain until after these January appointments.

In making these factual determinations, I have concluded that the medical records and medical histories, provided close-in-time to Petitioner's injury, more accurately reflect her contemporaneous symptoms, and thus are more persuasive than the affidavits and testimony presented by Ms. Lis, her family members, and Ms. Willis between two and nearly four years after the fact.

Ultimately, the weight of the evidence in this case demonstrates that Petitioner began experiencing symptoms of left shoulder pain around January 27, 2016.  Petitioner's testimony and affidavits in the face of contrary contemporaneous medical record evidence do not carry her burden of persuasion.

## V. Conclusion

I find that Petitioner began to experience symptoms of left shoulder pain around January 27, 2016.

The following is therefore **ORDERED**:

By no later than September 24, 2019, Petitioner shall file either an expert report supporting onset of left shoulder pain nearly four months after flu vaccination, or a status report indicating how she intends to proceed.

**IT IS SO ORDERED.**

<u>**s/Katherine E. Oler**</u>
Katherine E. Oler
Special Master